345-07/MEU
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
TOUTON FAR EAST PTE. LTD.
80 Pine Street
New York, NY  10005
Telephone: (212) 425-1900
Facsimile:  (212) 425-1901
Michael E. Unger (MU 0045)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SEAPLUS MARITIME CO., LTD.,

      Plaintiffs,      **07 CV 5903 (SAS)**

 - against -

TOUTON FAR EAST PTE. LTD.,
      Defendants.
------------------------------------------------------------x

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S MOTION
<u>FOR THE POSTING OF COUNTER-SECURITY</u>**

<u>Of Counsel</u>
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

NYDOCS1/292391.1

## **PRELIMINARY STATEMENT**

This matter involves a claim by Plaintiff SEAPLUS against Defendant TOUTON for damages for alleged breaches of three maritime contracts of charter party and for Defendant TOUTON's counter-claim against SEAPLUS for breaching one of the charter party contracts.

The merits of this matter are subject to arbitration at London (which TOUTON has commenced against SEAPLUS) and are not before this Court. Instead, this action is ancillary to the London arbitration proceedings and was brought by SEAPLUS for the purpose of obtaining security pursuant to Rule B. Defendant TOUTON hereby moves for counter-security for its counterclaim and costs pursuant to Rules E(2) and E(7).

## **FACTS**

Although the merits of this matter are not before the Court, a brief outline of the relevant background facts may be of assistance to the Court. The facts are fairly straightforward and are not in dispute.

In November, 2006 TOUTON entered into a maritime contract of charter party with SEAPLUS, as owner, for the use and operation of a vessel to be nominated ("the charter party"). The charter party between TOUTON and SEAPLUS was for a voyage involving the carriage of bulk wheat from China to Sri Lanka. Due to delays on the part of the shipper in supplying the cargo at the load port, SEAPLUS and TOUTON agreed to amend the charter to provide for a later loading date and with an increased freight rate. SEAPLUS subsequently nominated and TOUTON accepted the M/V JIN CANG as the vessel to perform the voyage. Based upon the nomination and acceptance of the M/V JIN CANG, TOUTON arranged for the cargo of wheat to be ready for

loading at the port in China. SEAPLUS, however, in breach if the charter party, subsequently advised TOUTON that it would not be able to tender the M/V JIN CANG on the agreed upon day in China and asked that another vessel, the M/V OPAL NAREE be substituted for the M/V JIN CANG. SEAPLUS, in further breach of the charter party, demanded that TOUTON pay an additional $4.50 per metric ton in freight above the sum which had been agreed under the amended charter party. Given that the cargo of wheat was ready for loading and the market rate for freight was even higher than the $37.25 per metric ton demanded by SEAPLUS, and in order to mitigate its damages, TOUTON agreed, under protest and duress, to the tender of the M/V OPAL NAREE and to the higher freight rate being demanded.

TOUTON's Counterclaim includes the following components: (a) $116,424.00 in overpaid freight; (b) interest at the rate of 8.5% per annum compounded quarterly over three years of $33,415.86; and (c) estimated London arbitration and attorneys' fees and disbursements of $35,000 for a total of $184,839.86. TOUTON has requested that SEAPLUS voluntarily post counter-security for TOUTON's counterclaim, but SEAPLUS has rejected TOUTON's requests.

In late June, 2007, SEAPLUS filed a Rule B action against TOUTON, and succeeded in restraining $178,450.45 in the form of a wire transfer being sent from TOUTON to pay a third party invoice for grain purchased by TOUTON. The $178,450.45 in security originally obtained by SEAPLUS included $75,000 in security for costs and attorneys' fees in connection with three London arbitrations which SEAPLUS claimed it intended to pursue against TOUTON. In fact, none of the arbitrations was ever pursued. In any event, the three charters incorporated the LMAA

FALCA Rules which place a cap on recoverable costs, including arbitrators' fees, for all three claims. Despite numerous requests since mid-August, only on October 18, 2007 did SEAPLUS agree to execute a stipulation providing for the release of $43,000 in excess security for costs. That stipulation was submitted to the Court on October 23, 2007 and it is anticipated the funds will be released shortly.

## ARGUMENT

## POINT I

## SEAPLUS MUST POST COUNTER-SECURITY

Rules E(2)(b) and E(7)(a) require SEAPLUS to post counter-security for TOUTON's counterclaim. Rule E(2)(b) provides in pertinent part as follows:

> [t]he court may…on the appearance of any defendant…require the plaintiff…to give security, or additional security, in such sum as the court shall direct to pay all costs and expenses that shall be awarded against the party by any interlocutory order or by the final judgment, or on appeal by any appellate court.

Whereas Rule E(2)(b)'s use of the word "may" allows the court to exercise broad discretion in granting counter-security for costs and expenses, Rule E(7)(a)'s use of the word "must" mandates the provision of counter-security for a counterclaim arising out of the same operative facts (unless the court directs otherwise), providing as follows:

> [w]hen a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise. Proceedings on the original claim must be

> stayed until this security is given unless the court directs otherwise.

*See generally* Result Shipping v. Ferruzzi Trading USA, 56 F.3d 394, 399-401 (2d Cir. 1995).

There are two principles generally to be followed in granting counter-security. The first is "to place the parties on an equality as regards security," Titan Navigation, Inc. v. Timsco, Inc., 808 F.2d 400, 403 (5th Cir. 1987) which favors granting counter-security when a defendant whose property has been attached asserts a non-frivolous counterclaim arising out of the same transaction, particularly when the defendant could have proceeded *in rem* or *quasi in rem* in an independent suit. The second principle is to avoid placing such burdensome costs on a plaintiff that it might be prevented from bringing suit. Id. at 403-05. To balance these principles, the court "must weigh the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring the defendant-counterclaimant to post security without affording reciprocal protection." Id. at 404.

TOUTON has requested that SEAPLUS voluntarily post counter-security for TOUTON's counterclaim, but such request has been rejected by SEAPLUS.

In this matter, the primary dispute in London arbitration will center on the question of who was responsible for breaching the charter party. Simply put, SEAPLUS' position is that TOUTON breached the charters by wrongfully failing to pay the full freight due under each charter party contract, while TOUTON's position is that SEAPLUS was in breach of the charter on the M/V JIN CANG and OPAL NAREE by failing to carry the cargo at the agreed freight rate and requiring TOUTON pay additional freight charges under duress. If SEAPLUS' argument in London is correct, TOUTON

may still be credited components of its counterclaim, such as overpaid charter hire. If TOUTON's argument in London prevails, however, SEAPLUS might not be entitled to any portion of its claim in respect to the M/Vs JIN CANG and OPAL NAREE.

A.   **TOUTON Should be Granted Rule E(7) Counter-Security**

TOUTON has asserted a counterclaim that arises from the same transaction or occurrence that is the subject of one of the claims in the original action brought by Plaintiff SEAPLUS. TOUTON's counterclaim is set forth in its Answer with Counterclaim, a copy of which is annexed to the Unger Affirmation as Ex. 1. The merits of TOUTON's counterclaim are before the London arbitration panel, but include the following components: (a) overpaid freight of $116,424.50; (b) interest at the rate of 8.5% per annum over a period of three years of $33,415.86; and (c) estimated London arbitration and attorneys' fees and disbursements of $35,000. TOUTON's counterclaim totals $184,839.86, for which TOUTON seeks counter-security from SEAPLUS pursuant to Rule E(7)(a).

In Dongbu Express Co., Ltd. v. Navios Corp., 944 F. Supp. 235 (S.D.N.Y. 1996), in a case where the main claim by the plaintiff was for the early termination of a charter party contract, the Court weighed the countervailing principles and found that the defendant was entitled to counter-security in the full amount of its claim,[1] despite the fact that the counterclaim sought more in damages than the allowable portion of the plaintiff's claim (following a reduction in the plaintiff's claim under Rule E(6)).

---

[1] The amount sought was partially off-set by security already obtained in a separate proceeding.

NYDOCS1/292391.1                                5

**B.      TOUTON Should be Granted Rule E(2) Security**

TOUTON also seeks, pursuant to Rule E(2)(b), security from SEAPLUS for the costs of this action, including but not limited to lost interest on the funds restrained by SEAPLUS should TOUTON be successful in the London arbitral proceedings and the funds ordered released. Despite numerous requests since mid-August, only on October 18, 2007 did SEAPLUS agree to execute a stipulation providing for the release of $43,000 in excess security for costs. That stipulation was submitted to the Court on October 23, 2007 and it is anticipated the funds will be released shortly. Nonetheless, SEAPLUS will retain $135,450.45 in security in respect of its claims. TOUTON's funds, which are currently being held by JPMorgan Chase Bank are not being held in interest-bearing accounts. It is anticipated that interest lost on the amount to remain secured by SEAPLUS at the rate of 8.5% per annum compounded quarterly over a period of three years is $38,876.

In Result Shipping, the court denied the request for E(2)(b) counter-security for costs on the basis that the restrained funds were being held in an interest-bearing account, so if the defendant was successful, the interest would revert to the defendant and would compensate the defendant (thereby acting as security) for the cost of maintaining the security. Result Shipping, 56 F.3d at 401. Here, however, the funds are not being held in interest-bearing accounts, and TOUTON has no such security. (Unger Aff. ¶ ).

The total amount of counter-security sought by TOUTON from SEAPLUS under Rules E(2)(b) and E(7) equals $223,715.86, and SEAPLUS should be required to post this amount of counter-security in TOUTON's favor.

C.   **SEAPLUS Should be Precluded from Proceeding With Its Claims Until Counter-Security is Posted**

Rule E(7)(a) provides that "Proceedings on the original claim must be stayed until [counter-security] is given unless the court directs otherwise." The purpose of this clause is obviously to impel the plaintiff into providing counter-security for the defendant's claims by barring pursuit of the plaintiff's claim until the counter-security is posted. In cases where the merits would be proceeding before the court that issued the attachment order, this clause provides an adequate check on the plaintiff's attachment remedy to avoid unfairness to a defendant entitled to counter-security.

In a case such as the one at bar, however, the merits of the plaintiff's claim are being pursued in arbitration in London. To avoid rendering this portion of Rule E(7)(a) devoid of all meaning, the Court should order SEAPLUS to halt its proceedings in London arbitration until such time as counter-security in favor of TOUTON is posted.

## CONCLUSION

For all the foregoing reasons, the attachment should be reduced, and SEAPLUS should be required to post counter-security in TOUTON's favor.

Dated: New York, New York
October 24, 2007

_____
Michael E. Unger